WILLIAM J. GEDDES
Nevada Bar No. 6984
KRISTEN R. GEDDES
Nevada Bar No. 9027
THE GEDDES LAW FIRM, P.C.
1575 Delucchi Lane, Suite 206
Reno, Nevada 89502
Phone: (775) 853-9455
Fax: (775) 299-5337
Email: Will@TheGeddesLawFirm.com
Email: Kristen@TheGeddesLawFirm.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DAVID MUSTARD, an individual; NICOLE ERICKSEN, an individual; and, TIMOTHY SMITH, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>COMSTOCK MINING, INC.; a domestic corporation; CORRADO DeGASPERIS, an individual; SCOTT JOLCOVER, an individual; LEO DROZDOFF, an individual; WALTER MARTING, JR., an individual; WILLIAM NANCE, an individual; J. CLARK GILLAM, an individual,<br><br>Defendants. | CASE NO: 21-cv-378<br><br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

COME NOW DAVID MUSTARD, NICOLE ERICKSEN and TIMOTHY SMITH, by and through counsel, William J. Geddes, Esq. and Kristen R. Geddes, Esq. of THE GEDDES LAW FIRM, P.C., and hereby complain as follows:

**I.**

**INTRODUCTION**

This is a Complaint by former employees DAVID MUSTARD, NICOLE ERICKSEN and TIMOTHY SMITH against Comstock Mining Inc., its Board of Directors, Audit and Finance Committee, Chief Executive Officer and managers for the termination of their employment in

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

retaliation for whistleblowing activity under the Sarbanes Oxley Act ("SOX"), 18 U.S.C. § 1514A, *et seq*., and associated common law tortious discharge claims.

## II.

### JUISDICTION AND VENUE

1.     The federal claims of this case are maintained pursuant to 28 U.S.C. § 1331.   In particular, this case asserts federal claims actionable under the 18 U.S.C. § 1514A(b)(1)(a). This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(a).

2.     Venue is proper in the U.S. District Court situated in Reno, Nevada, under Local Rule IA 1-6 and 28 U.S.C. § 1391(b) because this Court is located in the "unofficial Northern Division," embracing the City of Reno, County of Washoe, Nevada, and because:

(a)     Defendants conducted business in the Virginia City, County of Storey, Nevada where a substantial part of the events or omissions giving rise to the claims of the case occurred; and

(b)     Venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claims of the case occurred, or where any Defendants resides.

## III.

### PARTIES

3.     Plaintiff, DAVID MUSTARD ("MUSTARD"), was employed by COMSTOCK MINING, INC., as the Director of Finance from May 2018 to August 23, 2019, when he was terminated from his employment with Defendant COMSTOCK MINING, INC.

4.     Plaintiff, NICOLE ERICKSEN ("ERICKSEN"), was employed by COMSTOCK MINING, INC., as an Accounts Payable and Human Resources Associate from July 2016 to August 23, 2019, when she was terminated from her employment with COMSTOCK MINING, INC.

5.     Plaintiff, TIMOTHY SMITH ("SMITH"), was employed by COMSTOCK MINING, INC., as the Chief Accounting Officer from October 2017 to August 30, 2019, when he was terminated from his employment with COMSTOCK MINING, INC.

6.     Defendant COMSTOCK MINING, INC. ("COMSTOCK"), is   Nevada domestic corporation primarily engaged in gold and silver mining, whose principal place of business during all

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

1   relevant times during the facts stated in the Complaint was located in Virginia City, County of Storey,

2   Nevada.

3         7.    At all relevant times during the facts stated in the Complaint, Defendant CORRADO

4   DeGASPERIS ("DeGASPERIS") was the Executive Chairman of the Board of Directors, and Chief

5   Executive Officer and the Chief Financial Officer of COMSTOCK.

6         8.    At all relevant times during the facts stated in the Complaint, Defendants DeGASPERIS;

7   LEO DROZDOFF; WALTER "DEL" MARTING, JR.; WILLIAM ("BILL") NANCE; and, J. CLARK

8   GILLAM, served as Defendant COMSTOCK's Board of Directors and these Defendants may be

9   collectively referred to as the "BOARD."

10        9.    At all relevant times during the facts stated in the Complaint, Defendants WILLIAM

11  ("BILL") NANCE; LEO DROZDOFF; and WALTER "DEL" MARTING, JR., served as

12  COMSTOCK's Audit and Finance Committee, and these Defendants may collectively be referred to as

13  the "Audit Committee".

14        10.    At all relevant times during the facts stated in the Complaint, SCOTT JOLCOVER

15  ("JOLCOVER"), was the General Site Manager and the Director of Business Development of

16  COMSTOCK.

17        11.    At all times relevant herein, the Defendants identified in preceding ¶¶ 6-10 were related

18  business entities, such that they were parent entities, subsidiaries, co-owners, partners, franchisors,

19  franchisees, members, employers, employees, contractors, subcontractors, agents, and/or affiliates of

20  each other, who controlled, supervised, and/or directed each other, and/or who acted under the control,

21  supervision, and/or direction of each other, and who acted within the course, scope, and purpose of

22  such business relationships and affiliations, and each of these defendants is statutorily, negligently,

23  contractually, intentionally, recklessly, strictly, directly, derivatively, and/or otherwise culpable and

24  responsible in some manner for the events and happenings alleged herein, as each of these Defendants

25  proximately caused, and/or were otherwise legally liable for, the injuries alleged herein.

26        12.    At all times relevant herein, PLAINTIFFS are informed and believe, and thereon allege,

27  that each of the DEFENDANTS sued herein, was the agent, employee, servant or corporate employer

28  of the other and was acting within the scope and purpose of such an agency, employment, service, or

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

3

corporate activity, and that each of the DEFENDANTS sued herein is negligently, contractually, intentionally, recklessly, strictly, or otherwise responsible in some manner for the events and happenings alleged herein, and proximately caused the injuries alleged herein.

13.    At all times relevant herein, DeGASPERIS had sufficient authority over JOLCOVER, to direct, cause, and/or contribute to, the adverse actions taken against PLAINTIFFS, and on information and belief, directed, caused, and/or contributed to all adverse actions taken against PLAINTIFFS by DEFENDANTS, as described herein.

14.    At all times relevant herein, the Board and the Audit Committee of Defendant COMSTOCK owed Defendant COMSTOCK duties of independence, loyalty, and fiduciary obligations, and in acquiescing and ratifying the known bad acts of DeGASPERIS, the Defendants comprising the Board and Audit Committee, either by capture of  DeGASPERIS or otherwise, affirmatively engaged in culpable conduct resulting in the harm and injuries resulting to PLAINTIFFS as described herein.

15.    At all times relevant herein, the Defendants named as members of the Board and Audit Committee were aware of the unlawful practices, policies and actions pursued and maintained by DeGASPERIS, including those for which PLAINTIFFS complained and resisted unlawful activity as further described herein.   In taking independent violative action and in ratifying the violations of DeGASPERIS relating to the termination of PLAINTIFFS' employment and PLAINTIFFS', all Defendants are proper defendants amenable to suit herein for violations of the Sarbanes-Oxley Act and tortious discharge.

**IV.**

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

16.    PLAINTIFFS  MUSTARD, SMITH and ERICKSEN timely filed their complaint with the United States Department of Labor, Occupational Safety and Health Administration.  More than 180 days have elapsed since filing their complaint.  PLAINTIFFS have therefore, exhausted their administrative remedies.

. . .

. . .

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

4

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

**V.**

**ALLEGATIONS COMMON TO ALL CLAIMS**

17.     Defendant COMSTOCK is a Nevada-based, gold and silver mining company that is a publicly held corporation (NASDAQ symbol: LODE) and is thus subject to the provisions of 18 U.S.C. § 1514A.

18.     As further described herein, this Complaint arises from the termination of MUSTARD, SMITH and ERICKSEN after they reported what they reasonably believed was fraudulent conduct and/or other regulatory violations by CEO/CFO/Executive Chairman DeGASPERIS, including: (1) conflicts of interest; (2) inappropriate use of company funds, assets and employees; (3) potential stock price manipulation; and (4) the failure to report taxable events and improper conduct under wage and hour laws.   After they reported their concerns, MUSTARD, SMITH and ERICKSEN participated in an investigation into the activities of DeGASPERIS, and just 2-months after the conclusion of the investigation they were terminated under the specious theory that their positions were eliminated.

19.     Plaintiff ERICKSEN was hired by COMSTOCK in July 2016 as an Accounts Payable and Human Resources Associate.

20.     As an Accounts Payable and Human Resources Associate, ERICKSEN's duties included processing all invoices, entering data into QuickBooks, running weekly aging reports and issuing checks, completing new hire and termination paperwork for employees and all work connected with preparing and completing employee payroll and administration of the company's employee health insurance benefits.

21.     Plaintiff SMITH was hired by COMSTOCK as the Chief Accounting Officer in October 2017.

22.     SMITH's job duties as the Chief Accounting Officer included assessing the liquidity of the company, playing an instrumental role in determining the raise of cash by the sale of shares of common stock, working with Plaintiff MUSTARD in completing regulatory filings including 10-Q's, 10-K's and 8-K's, running different financial models for investment opportunities, including, but not limited to land and development, working with financiers regarding a rehabilitation facility on land owned by COMSTOCK, performing high-end financial analysis, and maintaining oversight of financial

5

1 operations, including bank accounts, accounts payable, payroll, human resources, and maintaining

2 compliance with tax regulations including the Internal Revenue Service ("IRS").

3     23.    MUSTARD was hired by COMSTOCK as the Director of Finance in May 2018.

4     24.    As the Director of Finance, MUSTARD, a certified public accountant, was also

5 responsible for high level accounting work, review of general ledger, structuring and reporting of

6 financial transactions, completing regulatory filings including 10-Q's, 10-K's and 8-K's, and serving as

7 the primary contact with COMSTOCK's outside auditor, Deloitte & Touche ("Deloitte"), which

8 included interfacing with Deloitte's audit team by fielding questions and providing documentation on a

9 quarterly basis.

10     ***Inappropriate Use of Company Funds for Personal Items***

11     25.    Part of ERICKSEN's job duties for accounts payable included reconciliation of

12 American Express card charges for a company American Express ("Amex") card used by

13 DeGASPERIS.

14     26.    Within two to three months of commencing her employment with COMSTOCK,

15 ERICKSEN first raised questions about the propriety of DeGASPERIS' Amex charges, which

16 appeared to be personal expenses, and/or expenses for which DeGASPERIS provided no receipts and

17 no determination could be made whether the expenses were legitimate business-related expenses.

18     27.    Examples of expenses that appeared to be personal charges included movies, meals, ski

19 lift tickets and retail purchase purchases at ski resorts, furniture and personal travel – both by air and

20 automobile.

21     28.    Additionally, where the COMSTOCK employee handbook required that the Amex not

22 be used for alcoholic beverages at business-related meals, DeGASPERIS' business-related meals

23 included purchases of copious amounts of alcohol purchases. In addition, purchases were made at local

24 convenience and liquor stores.

25     29.    When ERICKSEN was hired, she reported to Aneta Burge, the Chief Accountant.

26     30.    ERICKSEN first raised the questionability of DeGASPERIS' Amex usage to Aneta

27 Burge, who told Ericksen she did not know anything about whether DeGASPERIS' Amex usage were

28 legitimate business expenses. Burge directed ERICKSEN to ask Judd Merrill ("Merrill"), then-Chief

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

Accounting Officer.

31.    ERICKSEN brought her concerns about DeGASPERIS' Amex usage to Merrill. Merrill's response was a "shrug" of the shoulders, and no action was taken concerning DeGASPERIS' Amex usage.  Merrill subsequently left his employment with COMSTOCK around September 2016.

32.    ERICKSEN later learned that Merrill and DeGASPERIS were close friends, and ERICKSEN believed that Merrill told DeGASPERIS' that ERICKSEN was questioning his Amex usage. DeGASPERIS viewed ERICKSEN's questioning his Amex usage negatively, which motivated him to plan for ERICKSEN's termination for the first time in or around August 2018.   Ultimately, SMITH, who, by then, supervised ERICKSEN, persuaded DeGASPERIS not to terminate ERICKSEN in 2018.

33.    In or around August 2016, Elizabeth ("Liz") Self was hired as the Controller, in the place of Aneta Burge, who had left the company.   ERICKSEN brought her concerns about DeGASPERIS' Amex usage to Liz Self.   Again, no action was taken regarding DeGASPERIS' personal and/or indeterminable spending on the Amex card.

34.    ERICKSEN also brought the inappropriate use of the Amex card by DeGASPERIS to the attention of Scott Jolcover, General Site Manager, multiple times in 2019.    Jolcover told ERICKSEN he did not want to personally deal with the problem and directed her to discuss directly with DeGASPERIS.   Jolcover told ERICKSEN that it was an accounting issue and "not his job," despite that he was the General Manager, and above ERICKSEN in the chain of authority.

35.    After ERICKSEN brought her concerns to her supervisors or other management, *supra*, which did not result in any action being taken, ERICKSEN did question DeGASPERIS directly, requesting that he provide her with receipts for Amex purchases; and, where DeGASPERIS admitted to making personal purchases on the Amex, ERICKSEN requested DeGASPERIS write a personal check to the company to cover the expenses.  ERICKSEN recalls that on only one occasion, DeGASPERIS reimbursed COMSTOCK for a personal purchase, and that between 10-20 times she requested he do so, he did not.

36.    In August 2018, Liz Self left her employment with COMSTOCK.  After Liz Self left her employment with COMSTOCK, SMITH started becoming more involved in accounting tasks around

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

7

the fall of 2018 that had previously been performed by Liz Self.  ERICKSEN raised her concerns regarding DeGASPERIS' Amex usage to SMITH.

37.     SMITH, having extensive experience in corporate credit card use and accounting, agreed with ERICKSEN that DeGASPERIS' personal purchases and the failure to properly account for expenses was not in accordance with IRS requirements.  ERICKSEN and SMITH were concerned that COMSTOCK could not properly account for or demonstrate such expenses were valid if the company were subject to an audit.

38.     In late-2018, SMITH started having meetings with DeGASPERIS, with MUSTARD present, to discuss DeGASPERIS' Amex usage.  SMITH observed that there was approximately $10,000.00 per month being charged by DeGASPERIS on the Amex with very few receipts to back-up the purchases.  SMITH requested DeGASPERIS provide receipts to back-up the purchases so that appropriate and lawful categorization of the Amex purchases could be made.  Around the end of 2018, SMITH and MUSTARD had to turn their attention to preparing and filing COMSTOCK's 10-K, so the Amex issue was not examined further until early-2019.

39.     Notwithstanding that SMITH did not have the immediate ability to investigate the Amex issue further at this time, SMITH requested that ERICKSEN compile a list of all her concerns at the end of 2018.  ERICKSEN did compile such a list of concerns to SMITH that included: DeGASPERIS' Amex spending, failure to report company housing and car fringe benefits, FLSA classification and moving bonus for employee Ryan Burg, other wage and hour violations, garnishment of paid time off from MUSTARD and SMITH to make up for a company loss due to a fraudulent wire transfer, and the circumstances surrounding the resignation of Liz Self.

40.     ERICKSEN's reporting to her prior supervisors and her written description of concerns in 2018 to SMITH was information provided to a person with supervisory authority over the employee, and thus ERICKSEN is entitled to the protections afforded by 18 USC § 1514A(a)(1)(C).

41.     After the SEC filings were complete in early-2019, SMITH turned his attention back to analyzing the Amex issue.  In March 2019, SMITH analyzed the preceding 48-months of DeGASPERIS' Amex spending.  SMITH's analysis revealed that approximately $85,146.00 during that period appeared to be personal purchases and an additional $104,624.00 was expenses that were

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

8

"unknown" and were indeterminable as legitimate-business expenses, due to DeGASPERIS' failure to provide adequate records of the nature of the purchases.

42.     *Inter alia*, these concerns were reported to the COMSTOCK Audit Committee by MUSTARD and SMITH in their April 8, 2019, letter, *infra*.

### ***Fringe Benefits Reporting and Wage and Hour Violations***

43.     ERICKSEN also had concerns about the failure to properly report fringe benefits under IRS reporting requirements for company housing and vehicles used by COMSTOCK employees, including DeGASPERIS.

44.     In addition to concerns regarding fringe benefits reporting, ERICKSEN and SMITH were concerned about classification and certain payments to Ryan Burg upon his hiring at COMSTOCK.

45.     Ryan Burg ("Burg") was hired in or around June 2018 as an IT project intern.  Several months later, when Burg was converted from an intern to a regular employee, Burg's job offer letter from DeGASPERIS' stated that Burg was an exempt employee hired at a salary of $60,000.00 per year. In applying the Fair Labor Standards Act ("FLSA") regulations, ERICKSEN, as the Human Resources' Associate, did not agree that Burg's position qualified him to have exempt status.  SMITH agreed with ERICKSEN and challenged DeGASPERIS' decision to qualify Burg as an exempt employee – particularly since another employee doing similar work was classified as non-exempt.  SMITH explained the FLSA regulations to DeGASPERIS, who continued to disagree on the issue.  SMITH refused to disregard FLSA requirements and over DeGASPERIS' objection, required that Burg be classified as non-exempt.

46.     Further, ERICKSEN and SMITH were also troubled by the moving expense bonus offered by DeGASPERIS to Burg, which DeGASPERIS did not consider to be a taxable event. SMITH presented the governing IRS regulation to DeGASPERIS and held fast to his judgment that appropriate taxes were required to be withheld from the moving expense bonus. Ultimately, only upon SMITH's insistence was Burg's moving bonus treated as a taxable event.

47.     Other COMSTOCK employees, Zach and Elaine Spencer, were cited as an example of not having treated a moving expense bonus as a taxable event, which occurred prior to SMITH's

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

9

employment. Although a purported policy permitted giving a moving expense of up to $10,000.00, SMITH was never able to locate a copy of the policy or anyone who had seen it. SMITH requested ERICKSEN confirm whether the Spencer's moving expense of $20,000.00 to move from Elko, Nevada (far in excess of the amount authorized by the purported policy) was treated as taxable on the Spencer's W-2's – ERICKSEN confirmed the Spencer's were not taxed on their moving expense bonus, when it should have been taxable, further showing a continuing pattern of disregarding payroll tax regulations by DeGASPERIS.

48. *Inter alia*, the concerns regarding FLSA requirements and proper fringe benefits reporting, and taxation were reported to the COMSTOCK Audit Committee by MUSTARD and SMITH in their April 8, 2019, letter, *infra*.

### *Stock Price Manipulation*

49. In late-2018, DeGASPERIS exchanged text messages with COMSTOCK employee Zach Spencer, COMSTOCK's Director of External Relations, and included MUSTARD and SMITH in the text message group. It appeared to MUSTARD that DeGASPERIS was engaging in market manipulation by artificially affecting the demand for stock, causing the stock price to rise so that DeGASPERIS could give a positive report during an earnings conference call held October 30, 2018.

50. The text messages between DeGASPERIS and Spencer stated:

October 22, 2018 1:45 p.m.

    DeGASPERIS: We have a closing price [girl emoji]

October 22, 2018 3:09 p.m.

    DeGASPERIS: ANGEL!!

October 23, 2018 6:52 a.m.

    DeGASPERIS: Zach, please make sure we trade 1 million shares before 7 am. Thanks

October 30, 2018

    DeGASPERIS: Zach, please make sure we trade 1 million shares in the first hour of trading today.

    Zach Spencer: [replies with a screen shot of trading activity].

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

1   DeGASPERIS: Thank you.

2   DeGASPERIS: Please get the price up now.

3   Zach Spencer: [replies with a screen shot of stock price].

4   DeGASPERIS: Thank you.

5   Zach Spencer: Conf call, coming up!

6   DeGASPERIS: Calling in When? 7:50 am?

7   51.   MUSTARD and SMITH believed that such activity by DeGASPERIS constituted

8   violations of SEC regulations, which they reported to the COMSTOCK Audit Committee in their April

9   8, 2019, letter, *infra*.

10                              ***Conflict of interest***

11   52.   In March 2019, DeGASPERIS gave ERICKSEN a handful of crumpled receipts out of

12   the bottom of his backpack.

13   53.   Within the collection of receipts was a copy of a check on a Wells Fargo deposit receipt

14   in the amount of $25,000.00 from an individual named Vida Keller, to DeGASPERIS.   The check

15   deposit to DeGASPERIS appeared to be personal, and it was apparently inadvertently given by

16   DeGASPERIS to ERICKSEN.

17   54.   ERICKSEN immediately showed the receipt for the $25,000.00 check to SMITH, who

18   discussed it with MUSTARD.

19   55.   It appeared to all Plaintiffs that the payment from Vida Keller to DeGASPERIS

20   personally appeared to evidence actual or attempted improper inducement, or evidence of a conflict of

21   interest.

22   56.   In August 2018 when the check was written, Vida Keller was running for County

23   Commissioner for Lyon County, Nevada, an office which she had held previously and was also the

24   managing member of Downtown Silver Springs, LLC ("DTSS").

25   57.   DTSS held an option to buy a 160-acre parcel centrally located in Silver Springs,

26   Nevada.

27

28

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

11

58.     Without disclosing it to shareholders, or MUSTARD, SMITH or ERICKSEN, DeGASPERIS personally advanced $25,000.00 to Vida Keller in 2017 so that DTSS could maintain the option on the 160-acre parcel.

59.     COMSTOCK, around May and June of 2018, purchased DTSS from Vida Keller. COMSTOCK made a down payment to Vida Keller around late July or early August, 2018, just prior to the timing of the $25,000.00 deposit by DeGASPERIS of the check from Vida Keller.

60.     During a later meeting on issues raised by Plaintiffs, Director Nance remarked to MUSTARD and SMITH that DeGASPERIS "had money at risk."

61.     Ultimately, as the Director of Finance, MUSTARD required that $25,000.00 payment from Vida Keller to DeGASPERIS personally, be disclosed in COMSTOCK's second quarter 10-Q. The 10-Q stated in pertinent part, that:

> The Company's CEO advanced $25,000.00 to the equity holders of DTSS in 2017, from his own funds.  In the second quarter of 2018, the Company was presented with an opportunity to acquire DTSS, and after the disclosure of such advance, the Board of Directors unanimously approved such acquisition.  In connection with the close of the acquisition of DTSS in August of 2018, the equity holders of DTSS repaid $25,000.00 to the Company's CEO, without interest or profit.

62.     While ERICKSEN, MUSTARD and SMITH's concerns about the activities of DeGASPERIS had been ongoing, the $25,000.00 check discovered from Vida Keller to DeGASPERIS proved to be the tipping point and the employees felt that reporting of DeGASPERIS' actions in all respects was required.

63.     The COMSTOCK Whistleblower Policy and the COMSTOCK Code of Conduct and Ethics involves employees reporting possible violations of the law, accounting irregularities and other suspected wrongdoing to the Audit Committee.   In addition, the COMSTOCK Code of Conduct and Ethics contains additional requirements applicable to the CEO and Senior Financial Officers, including SMITH.

12

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

64.     Aware of requirements contained in the COMSTOCK Code of Conduct and Ethics and Whistleblower Policy, in or around March 2019, MUSTARD and SMITH sought independent legal counsel regarding reporting DeGASPERIS' activities.

65.     ERICKSEN, MUSTARD and SMITH aware of the protection from retaliation purportedly afforded by the Whistleblower Policy and the Company Code of Conduct and Ethics discussed their mutual concerns and prepared a letter outlining everything they reasonably believed was fraudulent and/or illegal conduct by DeGASPERIS.

66.     The letter  signed by MUSTARD and SMITH, was provided to Defendant MARTING at an in-person meeting between MUSTARD, SMITH and MARTING on or around April 8, 2019.

67.     A copy of the substance of the allegations in the letter referenced in ¶ 66 is attached hereto as **Exhibit 1** and is incorporated herein by reference.

68.     After MUSTARD and SMITH met with MARTING on or about April 8, 2019, MARTING reported that he consulted legal counsel and subsequently informed Defendant NANCE, the Audit Committee chair, of the letter from MUSTARD and SMITH.   Around that time, DeGASPERIS contacted SMITH late in the evening regarding the letter and demanded an early morning meeting with SMITH.  SMITH and DeGASPERIS met in SMITH's office at COMSTOCK the next morning, where DeGASPERIS was aggressive and threatening with SMITH regarding the matter of the letter.  Inasmuch as Plaintiffs voiced their fear of retaliation by DeGASPERIS in the April 8th letter[1], SMITH had not expected that NANCE would divulge the letter to DeGASPERIS before any investigation was conducted.

69.     The reports made by MUSTARD and SMITH (which also incorporated concerns of ERICKSEN) plausibly amounted to disclosure of conduct that Plaintiffs reasonably believed amounted to fraud in violation of one or more of the enumerated provisions in § 1514A or other Nevada law.

70.     MUSTARD and SMITH's reporting to the Audit Committee (which also incorporated concerns of ERICKSEN) entitles them to the protections afforded by 18 USC § 1514A(a)(1)(C) and

---

[1] Indeed, Complainants specifically asserted, "[b]ased on our observations and conduct of Corrado [DeGasperis] we have a real fear of retaliation."  (Emphasis added)

13

Nevada law.

71.     The Audit Committee initiated an investigation and retained the law firm of Foley & Lardner, LLP, to conduct the investigation and to advise COMSTOCK and the Audit Committee.

72.     Around the time when Plaintiffs brought their concerns forward in April 2019 and the investigation was commencing in May 2019, COMSTOCK's first quarter 10-Q was due for filing with the SEC. MUSTARD and SMITH indicated they could not sign the management representation letter required by Deloitte, as they could not truthfully attest that they were unaware of any fraud, alleged fraud, unremediated deficiencies, identified or suspected non-compliance with laws or regulations, uncertain tax positions or proceedings expected to have a material adverse impact on operations or cash flows, given their concerns raised in the April 8, 2019 letter.

73.     Thereafter, while the investigation was proceeding, great pressure was applied to MUSTARD and SMITH to sign the management representation letter, despite their concerns. This included being presented with a modified, one-paragraph statement drafted by Clyde Tinnen, Esq., a partner with Foley & Lardner, LLP and who acts in the capacity of COMSTOCK's General Counsel. MUSTARD and SMITH declined to sign the watered-down statement drafted by Tinnen, knowing that it did not adequately address the issues raised nor would it be acceptable to Deloitte.

74.     On or around May 1, 2019 Plaintiffs received a memorandum from Foley & Lardner attorney Byron McLain, Esq., which requested additional information and informed Plaintiffs that Foley & Lardner represented the Audit Committee.

75.     On or around May 9, 2019, MUSTARD and SMITH sent an e-mail to Clyde Tinnen, Esq. at Foley & Lardner raising concerns that they needed independent legal counsel given that the tone of McLain's memorandum appeared to be adversarial and accusatory, and that they requested COMSTOCK provide independent counsel to them.

76.     On or about May 10, 2019, ERICKSEN, MUSTARD and SMITH responded to requests for documentary evidence to attorney Byron McLain, Esq.

77.     Consistent with their e-mail sent on May 9, 2019, on or around May 15, 2019, ERICKSEN, MUSTARD and SMITH, along with Burg, attended an interview as a group with attorneys from Foley & Larder who had travelled to Reno, Nevada to conduct the interview and review

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

14

the documentation provided by Plaintiffs.

78.     Shortly after the interview began, SCOTT JOLCOVER burst into the meeting, red-faced and agitated, stating that COMSTOCK'S Chairman of the Board (*i.e.*, DeGASPERIS) and the chair of the Audit Committee (*i.e.*, NANCE) told JOLCOVER he could attend the interview of ERICKSEN, MUSTARD, SMITH and Burg.

79.     ERICKSEN, MUSTARD and SMITH interpreted JOLCOVER'S attendance at their investigatory interview as an attempt to intimidate them from giving information about their concerns and an effort to hear and report back what information was being given during their interviews. MUSTARD refused on behalf of the entire group to go forward with interview with JOLCOVER present, and ultimately, JOLCOVER was not permitted to attend their interview.

80.     The interview lasted around 4-5 hours.  ERICKSEN, MUSTARD and SMITH, as well as Burg, all discussed issues that they had concerns with, as set out in the April 8, 2019 letter.

81.     In late-May 2019, SMITH and MUSTARD attended a meeting with DeGASPERIS at Phelps Engineering in Reno, Nevada.  *Inter alia*, they were discussing the issues raised in the April 8, 2019 letter and what should be done about it.  DeGASPERIS was noticeably distraught and angry that ERICKSEN, MUSTARD and SMITH had reported these issues.  MUSTARD remarked to DeGASPERIS that there is a "material weakness"[2] here, referring to DeGASPERIS' activities as reported in the April 8, 2019 letter  DeGASPERIS threatened MUSTARD, in front of SMITH, stating that DeGASPERIS  "would professionally ruin" MUSTARD.

82.     In early June 2019, a phone call was held with Audit Committee members NANCE and MARTING, and counsel, and MUSTARD and SMITH about the outcome of the investigation.

83.     NANCE and MARTING told MUSTARD and SMITH that the investigation had concluded, and that no wrongdoing was substantiated.  Consequently, NANCE and MARTING

---

[2]A material weakness is an accounting term that refers to one or more of a company's internal controls—activities, rules, and processes designed to prevent significant financial statement irregularities and improve operation efficiency—is ineffective. If a deficiency in internal control is a material weakness, it could result in a material misstatement in a company's financial statements. This would make the company's financial statement data unreliable and ineffective for assessing the company's financial health and determining a reasonable company stock price.

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

1  requested MUSTARD and SMITH sign the management representation letter to file the outstanding

2  first quarter 10-Q.

3       84.    MUSTARD and SMITH requested to review the results of the investigation but were

4  denied.  Since they were not shown the investigation report, MUSTARD and SMITH stated they were

5  still not comfortable signing the management representation letter, as they had seen no evidence that

6  there was no fraud, alleged fraud, unremediated deficiencies, identified or suspected non-compliance

7  with laws or regulations, uncertain tax positions or proceedings expected to have a material adverse

8  impact on operations or cash flows.  Consequently, the phone call ended at an impasse regarding

9  MUSTARD and SMITH signing the management representation letter.

10       85.  In early June 2019, subsequent to the phone call described above, MUSTARD and SMITH

11  conferred with Joel Van Cott, the audit partner from Deloitte on the COMSTOCK engagement,

12  regarding the management representation letter and the request by MARTING and NANCE for

13  MUSTARD and SMITH to sign off merely on the insistence of the Audit Committee members.  Van

14  Cott was incredulous that this was being requested of MUSTARD and SMITH, and Van Cott

15  intervened with NANCE on the issue.

16       86.    On or around June 14, 2019, attorney McLain called MUSTARD and SMITH to discuss

17  the outcome of the investigation.  McLain stated that everything MUSTARD and SMITH reported in

18  the April 8, 2019 letter was "factually correct" in discussing the outcome of the investigation.

19       87.    Shortly after the June 14 telephone call with attorney McLain, MUSTARD and SMITH

20  signed the management representation letter, with appropriate language added by Deloitte referencing

21  the investigation and the action taken by the Audit Committee and the first quarter 10-Q was filed with

22  the SEC on or around June 20, 2019.

23       88.    The management representation letter signed by MUSTARD and SMITH concerning

24  COMSTOCK's second quarter 10-Q report added language that addressed their whistleblowing.  This

25  language was added by Deloitte.

26       89.    Notwithstanding the representations of MARTING and NANCE that the investigation

27  did not reveal any wrongdoing, on or about June 14, 2019, the Audit Committee passed a sweeping

28  resolution specifically referencing MUSTARD and SMITH'S April 8th letter, and which: affirmed

The Geddes Law Firm, P.C.
1575 Delucchi Lane, Suite 206
Reno, NV 89502
Phone 775-853-9455

16

some of DeGASPERIS' purchases on the Amex were personal requiring he reimburse the company; recommended that Company policies be created or reviewed concerning: "per diem" food and lodging expenses in company housing for overtime; requiring Board approval in advance of transactions over a certain amount; considering a change away from the Amex company card to another reimbursement system; updating DeGASPERIS' employment agreement – particularly concerning travel expenses; quarterly review of travel and entertainment expenses by the Committee or Board; personal use of Company residences logging and tracking (*i.e.*, fringe benefits); logging of overtime; wire transaction procedures; documentation concerning the reverse stock split; and requiring more detailed itemization and documentation of payments to outside vendors and the purpose of such payments.

90.     On the information and belief of MUSTARD and SMITH, COMSTOCK also self-reported an issue to the SEC as a result of the investigation; however, the nature of COMSTOCK's self-reporting was not disclosed to MUSTARD or SMITH.

91.     DeGASPERIS was angry and unhappy about ERICKSEN, MUSTARD and SMITH's persistence in following proper accounting and financial protocols and by their causing an investigation into same.

92.     DeGASPERIS was also angry that Vida Keller had been interviewed during the investigation. DeGASPERIS told MUSTARD and SMITH that Keller was "pissed," inasmuch as complaints against Keller had historically been filed with the Nevada Ethics Commission that DeGASPERIS had attempted to curry the favor of her vote on the Commission. DeGASPERIS stated words to the effect that they were "ruining the reputation of the county official that we do business with," and that they had hurt the company, inferring to their exposing wrongdoing on these issues.

93.     DeGASPERIS was upset and irritated with MUSTARD and SMITH for their refusal to sign the management representation letter and attributed the untimely filing of the 10-Q to the investigation into their concerns and the refusal to sign the management representation letter based on those concerns.

94.     DeGASPERIS was aware of the identities of PLAINTIFFS by their attempts to address many of these issues directly with him before and after the April 8, 2019 letter, by MUSTARD and SMITH signing their name to the letter, and by JOLCOVER's probable reporting back to

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

17

DeGASPERIS the identity of the employees that attended and participated in the investigation interview. As well, the identities of PLAINTIFFS were known to COMSTOCK and DEFENDANTS named herein.

95.     On August 23, 2019, DeGASPERIS called MUSTARD into a meeting that JOLCOVER was present for part of. DeGASPERIS told MUSTARD his position was being eliminated and he was terminated.

96.     Additionally, on August 23, 2019, DeGASPERIS and JOLCOVER called ERICKSEN into a meeting and told ERICKSEN her position was being eliminated and she was terminated. At one point during the meeting, JOLCOVER stepped out of the meeting and DeGASPERIS repeatedly urged ERICKSEN that she should keep confidential about any and all matters having to do with COMSTOCK.

97.     Ryan Burg was also terminated on August 23, 2019.

98.     Additionally, DeGASPERIS called SMITH into a meeting on or around August 26, 2019. DeGASPERIS presented SMITH with a multi-page letter that indicated SMITH was voluntarily resigning his position. SMITH refused to sign the letter.

99.     Later, on August 30, 2019, DeGASPERIS told SMITH his position was being eliminated and that he was terminated.

100.    On September 11, 2019, in response to their collective terminations, MUSTARD, SMITH and ERICKSEN e-mailed a letter to the Audit Committee alleging that their terminations were in retaliation for their protected activity made in good faith to the Audit Committee, and that they were terminated for whistleblowing and participation in the investigation. In particular, PLAINTIFFS cited the *Upjohn* statement they were provided during their investigation interview, which affirmed that they were protected from retaliation in their whistleblowing activities.

101.    The Audit Committee, through its attorneys, denied that the termination of PLAINTIFFS' employment was retaliatory, and thereby participated in, ratified and reaffirmed the violations of PLAINTIFFS' rights as alleged herein.

. . .

. . .

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

18

## VI.

### FEDERAL LAW CLAIMS

### FIRST CLAIM FOR RELIEF
### WHISTLEBLOWER PROTECTION RELIEF PURSUANT TO THE SARBANES-OXLEY ACT ("SOX"), 18 U.S.C. § 1514A, *et seq.*

### (AGAINST ALL DEFENDANTS)

102.    PLAINTIFFS refer to and incorporate by reference the allegations in the preceding Paragraphs above as though fully set forth herein.

103.    PLAINTIFFS MUSTARD, SMITH and ERICKSEN were employees of a publicly traded company, COMSTOCK, which is subject to the provisions of section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l and/or section 15(d) of said Act (15 U.S.C. § 780(d)).

104.    PLAINTIFFS MUSTARD, SMITH and ERICKSEN provided information or otherwise assisted in an investigation regarding conduct that they reasonably and in good faith believed constituted a violation of one or more of the enumerated provisions of 18 U.S.C. § 1514A(a)(1).

105.    The identities of PLAINTIFFS MUSTARD, SMITH and ERICKSEN and the fact of their disclosure was known to COMSTOCK its officers, directors and/or managers.

106.    DEFENDANTS discharged PLAINTIFFS MUSTARD, SMITH and ERICKSEN in retaliation for lawful acts done by them to provide information or otherwise assist in an investigation regarding conduct that they reasonably and in good faith believed constituted a violation of the enumerated provisions of 18 U.S.C. § 1514A(a)(1).

107.    As a direct and proximate result of such retaliation, PLAINTIFFS MUSTARD, SMITH and ERICKSEN have suffered actual damages and sustained injury, harm, suffering, mental anguish, and damages, entitling PLAINTIFFS to compensatory and special damages as allowed by law.

108.    As a direct and proximate result of such retaliation, PLAINTIFFS MUSTARD, SMITH and ERICKSEN have had to retain the services of attorneys in this matter and therefore, seek reimbursement for attorney's fees and costs.

. . .

. . .

. . .

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

19

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

## VII.

### STATE LAW CLAIMS

### SECOND CLAIM FOR RELIEVE
### TORTIOUS DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (WHISTEBLOWING)

### (AGAINST ALL DEFENDANTS)

109.     PLAINTIFFS incorporate by reference all prior allegations of this *Complaint*, as though fully set forth herein.

110.     Nevada's public policy prohibits tortious discharge for whistleblowing which serves a public purpose.

111.     At all relevant times herein, the adverse actions and decisions taken by DEFENDANTS against PLAINTIFFS were based on or were because of PLAINTIFFS MUSTARD, SMITH and ERICKSEN protected activity when they reported what they reasonably believed to be violations of state and federal law.

112.     DEFENDANTS were aware of PLAINTIFFS MUSTARD, SMITH and ERICKSEN's complaints made to their direct supervisors and the Audit Committee.

113.     DEFENDANTS' termination of PLAINTIFFS MUSTARD, SMITH and ERICKSEN was based upon or motivated by PLAINTIFFS' protected whistleblowing activity.

114.     DEFENDANTS' tortious discharge of PLAINTIFFS in retaliation for their protected whistleblowing activity, was willful, malicious, and/or engaged in with a reckless indifference to the health, safety, wellbeing, and protected rights of PLAINTIFFS MUSTARD, SMITH and ERICKSEN — including because DEFENDANTS summarily terminated PLAINTIFFS after they pursued their rights, and further ratified and reaffirmed the termination of their employment when PLAINTIFFS complained that their terminations were retaliatory, and DEFENDANTS were aware of their legal rights —warranting an award of punitive damages, to punish DEFENDANTS, in an amount determined by a jury at trial, according to law.

115.     PLAINTIFFS MUSTARD, SMITH and ERICKSEN have suffered, and continue to suffer, economic losses, including lost wages and benefits, back pay, front pay, physical and emotional

20

harm, including mental anguish, inconvenience, and the loss of enjoyment of life, for which they are entitled to compensatory and equitable damages, in an amount to be proven at trial.

116.    As a result of such intentional, unlawful, and retaliatory conduct against PLAINTIFFS MUSTARD, SMITH and ERICKSEN by DEFENDANTS, PLAINTIFFS have had to retain the services of attorneys in this matter, and they, therefore, are entitled to, and seek reimbursement for, their attorneys' fees and costs, their expert-witness fees, and their court costs, in an amount to be proven at trial.

117.    As a result of such intentional, unlawful, and retaliatory conduct against PLAINTIFFS MUSTARD, SMITH and ERICKSEN by DEFENDANTS, PLAINTIFFS are entitled to, and seek, declaratory relief, in the form of a declaration by this Court, that DEFENDANTS violated PLAINTIFFS' rights by engaging in unlawful retaliation, as alleged herein.

118.    As a result of such intentional, unlawful, and retaliatory conduct against PLAINTIFFS MUSTARD, SMITH and ERICKSEN by DEFENDANTS, PLAINTIFFS are entitled to, and seek, injunctive relief, in the form of an injunction issued by this Court, that compels Defendants to give effect to the rights of PLAINTIFFS, and to take other appropriate action, including: the removal of all adverse information from their employee file, relevant to the claims of this case; and, if appropriate and feasible, the reinstatement of PLAINTIFFS to their prior employment position, with full pay and benefits, as if never terminated.

**VIII.**

**THIRD CLAIM FOR RELIEF**
**TORTIOUS DISCHARGE IN VIOLATION OF PUBLIC POLICY**
**(REFUSAL TO VIOLATE THE LAW OR OTHERWISE ENGAGE IN UNLAWFUL ACTIVITIES)**

**(AGAINST ALL DEFENDANTS)**

119.    PLAINTIFFS incorporate by reference all prior allegations of this *Complaint*, as though fully set forth herein.

120.    Nevada's public policy prohibits tortious discharge for an employee's refusal to violate the law or otherwise engage in unlawful activities.

121.    At all relevant times herein, the adverse actions and decisions taken by DEFENDANTS

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

against PLAINTIFFS were based on or were because of PLAINTIFFS MUSTARD, SMITH and ERICKSEN refusal to violate the law or otherwise engage in unlawful activity and/or engage in what they reasonably believed to be violations of state and federal law, as described herein, including without limitation, the following unlawful activities:

      (a)    unlawful use of company funds for personal items, including as described in ¶¶ 25-42 hereinabove;

      (b)    unlawful reporting of fringe benefits and wage and hour violations, including as described in ¶¶ 43-48 hereinabove.

      (c)    unlawful stock price manipulation, including as described in ¶¶ 49-51 hereinabove;

      (d)    unlawful conflict of interest, including as described in ¶¶ 52-100 hereinabove;

      (e)    unlawful failure to report taxable events under tax law and regulations, including as alleged herein, including as described in ¶¶ 18, 39,  22, 46-48, 71, and 83 hereinabove;

      (f)    unlawful failure to abide by FLSA statutes and regulations as alleged herein, including as described in ¶¶ 39, 45, and 48; and

      (g)    unlawful failure to comply with SOX as described hereinabove;

122.    At all times relevant herein, DEFENDANTS expected, encouraged, requested, and/or required PLAINTIFFS MUSTARD, SMITH and ERICKSEN to engage in these violations of the law and unlawful activities, including by expecting, encouraging, requesting, and/or requiring that PLAINTIFFS' "look the other way," not report these violations, acquiesce in these violations, ratify these violations, and otherwise aid and abet DEFENDANTS in committing these violations.

123.    However, PLAINTIFFS MUSTARD, SMITH and ERICKSEN refused to engage in these violations of the law and unlawful activities, including by *refusing to* "look the other way," not report these violations, acquiesce in these violations, ratify these violations, or otherwise aid and abet DEFENDANTS in committing these violations.

124.    DEFENDANTS were aware of PLAINTIFFS MUSTARD, SMITH and ERICKSEN's refusal to violate the law or otherwise engage in unlawful activity including by their *refusals to* "look

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

the other way," not report these violations, acquiesce in these violations, ratify these violations, or otherwise aid and abet DEFENDANTS in committing these violations, and including as shown by their complaints made to their direct supervisors and the Audit Committee.

125.   DEFENDANTS' termination of PLAINTIFFS MUSTARD, SMITH and ERICKSEN was based upon or motivated by PLAINTIFFS' refusal to violate the law or otherwise engage in unlawful activity and/or engage in they reasonably believed to be violations of state and federal law.

126.   DEFENDANTS' tortious discharge of PLAINTIFFS in retaliation for their refusal to violate the law or otherwise engage in unlawful activity and/or engage in what they reasonably believed to be violations of state and federal law, was willful, malicious, and/or engaged in with a reckless indifference to the health, safety, wellbeing, and protected rights of PLAINTIFFS MUSTARD, SMITH and ERICKSEN — including because DEFENDANTS summarily terminated PLAINTIFFS after they pursued their rights, and further ratified and reaffirmed the termination of their employment when PLAINTIFFS complained that their terminations were retaliatory, and DEFENDANTS were aware of their legal rights —warranting an award of punitive damages, to punish DEFENDANTS, in an amount determined by a jury at trial, according to law.

127.   PLAINTIFFS MUSTARD, SMITH and ERICKSEN have suffered, and continue to suffer, economic losses, including lost wages and benefits, back pay, front pay, physical and emotional harm, including mental anguish, inconvenience, and the loss of enjoyment of life, for which they are entitled to compensatory and equitable damages, in an amount to be proven at trial.

128.   As a result of such intentional, unlawful, and retaliatory conduct against PLAINTIFFS MUSTARD, SMITH and ERICKSEN by DEFENDANTS, PLAINTIFFS have had to retain the services of attorneys in this matter, and they, therefore, are entitled to, and seek reimbursement for, their attorneys' fees and costs, their expert-witness fees, and their court costs, in an amount to be proven at trial.

129.   As a result of such intentional, unlawful, and retaliatory conduct against PLAINTIFFS MUSTARD, SMITH and ERICKSEN by DEFENDANTS, PLAINTIFFS are entitled to, and seek, declaratory relief, in the form of a declaration by this Court, that DEFENDANTS violated PLAINTIFFS' rights by engaging in unlawful retaliation, as alleged herein.

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

130.    As a result of such intentional, unlawful, and retaliatory conduct against PLAINTIFFS MUSTARD, SMITH and ERICKSEN by DEFENDANTS, PLAINTIFFS are entitled to, and seek, injunctive relief, in the form of an injunction issued by this Court, that compels Defendants to give effect to the rights of PLAINTIFFS, and to take other appropriate action, including: the removal of all adverse information from their employee file, relevant to the claims of this case; and, if appropriate and feasible, the reinstatement of PLAINTIFFS to their prior employment position, with full pay and benefits, as if never terminated.

## IX.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows:

1.    For equitable relief, including back pay and front pay;

2.    For general, compensatory damages on all claims, in an amount to be proven at trial;

3.    For special, compensatory damages on all claims, in an amount to be proven at trial;

4.    For past and future compensatory damages, including incidental and consequential losses, incurred by reason of Defendants' acts, omissions, carelessness, negligence, deliberate indifference, and other culpable conduct described herein, in an amount to be proven at trial;

5.    For exemplary and punitive damages, as allowed by law;

6.    For costs of the suit incurred herein;

7.    For attorneys' fees, costs, and prejudgment interest, as allowed by law;

8.    For experts' fees, costs as allowed by law, in an amount in an amount to be determined at trial;

9.    For Declaratory relief, equitably determined by the Court at trial. Pursuant to 28 U.S.C. § 2201, Federal Rule of Civil Procedure 57, 42 U.S.C. §§ 2000e-5, NRS 30.070, NRS 30.100, NRS 613.333, and the Court's inherent equitable powers, Plaintiffs seek, and are entitled to have, declaratory relief awarded in their favor, to declare their rights and the obligations of Defendants, which matters are now in controversy or dispute, where such declaratory relief is necessary and proper to the termination of the disputes raised herein,

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

The Geddes Law Firm, P.C.
1575 Delucchi Lanie, Suite 206
Reno, NV 89502
Phone 775-853-9455

including as specifically prayed for below, including declaratory relief whereby the Court issues a declaration that Defendants unlawfully retaliated against Plaintiffs in violation of SOX, and otherwise violated Plaintiffs' rights under federal law and state law, as alleged herein, and regarding the rights and obligations of the parties, relating to Plaintiffs' employment;

10.   Based on the foregoing, Plaintiffs have suffered an irreparable injury, and the remedies available at law, such as monetary damages, are inadequate to compensate for that injury.   This inadequacy is, in part, based on the fact that Defendants   is currently maintaining false and disparaging information about Plaintiffs' work performance and tenure, which will be discovered by third parties, including prospective employers of Plaintiffs, which will interfere with their ability to obtain employment, including re-employment at Defendants.  As such Plaintiffs are entitled to injunctive relief, including an injunction compelling Defendants:

(a)   To remove false, adverse information contained in his personnel files relating to the claims of this case;

(b)   To provide only a "neutral" job reference concerning Plaintiffs' tenure at Defendants, to all inquiring prospective employers; and

(c)   To reinstate Plaintiffs' employment, if feasible and appropriate, with full pay and benefits, as if never terminated.

Considering the balance of hardships between Plaintiff and Defendants, a remedy in equity is warranted, and the public interest would not be disserved by issuance of such injunctive relief. Plaintiffs herein seeks Injunctive relief, equitably determined by the Court at trial;

11.   For such other relief as the Court may deem just and proper; and

. . .

. . .

. . .

. . .

. . .

25

12.     Pursuant to the *Federal Rules of Civil Procedure*, Rule 38, Plaintiffs demands a trial by jury on all issues triable by right of a jury.

Dated this 20<u>th</u> day of August 2021.

THE GEDDES LAW FIRM, P.C.

WILLIAM J. GEDDES
Nevada Bar No. 6984
KRISTEN R. GEDDES
Nevada Bar No. 9027
THE GEDDES LAW FIRM, P.C.
1575 Delucchi Lane, Suite 206
Reno, Nevada 89502
Phone: (775) 853-9455
Fax: (775) 299-5337
Email: Will@TheGeddesLawFirm.com
Email: Kristen@TheGeddesLawFirm.com
*Attorneys for Plaintiffs*

# EXHIBIT 1

# EXHIBIT 1

April _____, 2019

Del Marting
Audit Committee Member – Board of Directors
Comstock Mining Inc.
Hand Delivered

Subject:        **Inappropriate Actions by CEO Corrado DeGasperis**

Mr. Marting,

We are addressing this letter to you in your capacity as a member of the Audit Committee of the
Comstock Mining Inc. Board of Directors.  Over a period of several months, many issues related to the
conduct and actions of Corrado DeGasperis, Executive Chairman, CEO and CFO have come to our
attention.  We have tried to resolve some of these directly with Corrado, without much success.  As we
believe that it is our responsibility to protect shareholder interests, we are bringing these issues to your
attention.

Based on our observations and conduct of Corrado, we have a real fear of retaliation.  As such it has
been very difficult for us to determine how to best bring these serious matters to light. The nature of
some of these issues with regulatory and human resource issues are to the point where action needs to
be taken.  For instance, we recently had an employee resign temporarily due to one of these matters.
After much deliberation, we determined the best course of action was to personally deliver our findings
to you.

We have attached a list of the primary issues that we have found that show conflict of interests,
inappropriate use of Company funds, assets and employees, regulatory issues and many instances of
harassment of employees.  While we may have been able to overlook a single or minor transgressions,
our observation and conclusion is that there is a pattern over an extended period of time of a wide
range of offenses.  In the best interests of the Company and its shareholders, we are submitting these
findings to you for resolution.  We suggest that an independent investigation be conducted to
determine the validity and extent of these issues, reported in good faith.

Sincerely,

Timothy D. Smith
Chief Accounting Officer

David Mustard
Director of Finance

1. Conflict of Interest on DTSS LLC / 160 acres.
    a. Based on discussion with other employees, we understand that Corrado personally funded $25k to Vida Keller to extend option on 160 before CMI purchased DTSS. He was paid back from the funds CMI paid to purchase DTSS from Vida.
    b. The valuation of DTSS LLC for the purchase price of $500,000 that only held an option seems questionable, particularly in light of CMI not pursuing the option with Timberline, based on the argument that the value would decrease as the expiration date approached and that we could obtain an option after their option expired. We could have done the same thing with this option.
    c. Vida Keller was paid in $115,000 in advance, from November 2015 to April 2018 for commissions on the sale of the 98 acres, which has yet to occur. Those funds were used by Vida Keller to extend the option on the 160 acres. These sales commissions were paid on a property that CMI still owns and were expensed. We have been unable to ascertain when the Board officially approved the purchase of DTSS LLC and the large expenditure of funds for the non-refundable deposits but the payments to payments to Vida Keller possibly pre-dated that approval. It is possible that the Company and the CEO had invested significant funds before the Board approved the transaction.

2. Inappropriate Use of Company funds in 2018 and 2019
    a. Funding for Sliver Springs Capital Partners ("SSCP").
        1. $25,000 paid by CMI as down payment on the potato plant deal that SSCP agreed to purchase. As of 3/29/19, the Company has yet to be reimbursed.
        2. The two $12,500 deposits have not been paid by SSCP, as of 3/29/19 on the agreements for the purchase of the 98 acre site and 160 acre option from CMI.
        3. CMI paid for Phase I environmental on airport and potato plant.
    b. Spent $55,000 on potential purchase of the local newspaper from former employee and current employee, in 2018 and early 2019. We then had to structure the transaction so that the current manager became the owner, so we would not violate terms of GF Loan. We are getting $100/monthly payments on the $55,000.
    c. $60,000 + spent with Vista Partners on website with a website that did not receive good reviews from the staff. This was a decision made by Corrado without consultation with staff. Website is still not up yet after about 2 years of internal efforts, the hiring of an on-staff IT person, of which the primary reason for the position was to get a new website live. We committed to this in press releases but have yet to deliver.
    d. Use of company property, the Daney Ranch main house by Robin Rudnikoff, who was associated with CereCare, at no cost. Per reports of other employees, she used the Chevy Tahoe for a period of time. Corrado had company staff help move her from her former residence to the Daney Ranch. In addition, another person and Corrado's family members reportedly lived or have stayed at the Ranch. The Upper House was left in disarray, as reported in a staff meeting. All of this occurred in late 2018 and 2019. In addition, Corrado purchased furniture in 2019 for the Daney Ranch with Company funds, likely due to the increase in occupants.

3. Use of Company funds for personal items. Review of a recent 13 month period shows that over $70,000 in charges to the Company's Amex card were for personal expenditures or do not have receipts where we can ascertain if business or personal.
    a. Travel from Reno to wedding in Florida for family in February 2019.

    b.  Ski trip to Squaw Valley in Spring 2018.   Per discussion of staff with Corrado, this was with his son and cousin.  Total costs about $849.

    c.  $415 purchase at a store in Tahoe City at the same time as the family ski trip to Squaw that is possibly art work.

    d.  Ikon ski pass $749, purchased December 2018.

    e.  Unexplained hotel stay near home in November 2018 for $822, on a weekend.

    f.  Charges related to travel to son's football game in Connecticut totaling about $1,411 in October 2018.

    g.  Many, many missing receipts which makes it difficult to determine validity of expenses.  This has been an issue for several years.

4.  Texts from Corrado regarding stock price movements indicate potential stock manipulation in late 2018.  Texts were to Zach Spencer, and copied to Tim and David.

5.  Inappropriate & Harassing emails, texts and meeting comments.

    a.  Comments to Ryan Burg and Nicole Ericksen in meeting, with entire staff, in 2019.

    b.  Emails to Scott Jolcover with inappropriate language questioning his mental state and medications.

    c.  Investigation of emails will show more.

    d.  Corrado attempted to have an email policy put in place to limit email retention.  In our view, this was likely to reduce his exposure for inappropriate emails but the email retention change was put on hold due to the Precious Metal lawsuit.

6.  Tax Issues

    a.  Corrado out of compliance with employment contract with travel expenses, to and from New York, unless this was approved by the Board but not communicated to the finance staff.

    b.  No tax on free use of company housing.

    c.  No tax on personal use of Chevy Tahoe.

    d.  [redacted] has not filed tax returns since inception.  While [redacted] is the managing member and responsible for the tax returns, we have knowledge of the issue and have allowed it to not be rectified.  From our understanding, no tax returns from [redacted] have been filed since inception, a period of x years.

7.  Other

    a.  Wage & Hour violations

        1.  Reporting of hours by [redacted] – underreported despite multiple attempts by Accounting staff in 2017 and 2018 to rectify.  In lieu of some overtime pay, the employee was granted period of no rent in his Company owned housing or use of Company equipment for side jobs.  Finally, in 2019, Tim was able to get Scott to agree to proper reporting.

        2.  Forced "voluntary" reduction of PTO time to pay for a mistake in a fraudulent email and wire.

    b.  Not reducing shares in stock incentive plan in conjunction with reverse split.  This was done in the 2017 10K, but then ratcheted back up in the 2018 Proxy.  We are unsure if this is allowable or not but on the face of it, does not appear to be right.  We asked for support showing Board approval of this but were never provided any.

c.  $182,086 in payments from 2014 to 2019 to a former employee.  Level of work does not seem to justify payments.  In drastic cost cutting actions in 2016, 2017 and 2018, this was always off limits when Finance staff brought up cost savings.  Work could have been performed by staff.  Something is seemingly not right about this situation.

d.  Payments to employees in prior years of housing/moving costs without proper documentation or in lieu of that, tax reporting.